[Civ. No. 10698. Third Dist. Feb. 7, 1964.]

NEVADA IRRIGATION DISTRICT, Plaintiff and Respondent, v. KEYSTONE COPPER CORPORATION, Defendant and Appellant.

·524

Edwin J. Regan, Donald R. Kennedy and Regan & Kennedy for Defendant and Appellant.

Minasian & Minasian and David H. Minasian for Plaintiff and Respondent.

PIERCE, P. J.—On this appeal from a judgment quieting plaintiff district's tax title against defendant corporation we hold that the former's collector's deeds did not intend to, and did not, divest said corporation's subsurface (mining) estate held in fee simple, this because the district did not

intend to and did not levy taxes upon said mining rights; that, therefore, said corporation's defense and cross-complaint were not barred by limitations under Water Code section 26304. The discussion below will develop the reasons impelling these conclusions.

Defendant, Keystone Copper Corporation (hereinafter "Keystone"), became owner of adjoining Nevada County quartz gold and silver mines in 1952. Its title was in fee simple to the subsurface estate.[1] It deraigned by mesne conveyances extending back to an original owner (Jennings) of both surface and subsurface estates. Its immediate predecessor was Lava Cap Gold Mining Corporation (hereinafter "Lava Cap") which had acquired the property in 1932.

The lands in question are within Nevada Irrigation District (hereinafter "district") organized in 1921. After its creation, the district commenced to assess the land within the district. The evidence hereinafter to be reviewed in detail shows clearly that it intended only to assess and tax the surface estate. It caused assessment rolls to be prepared annually which contained the surface description of said lands and its assessment map delineated the boundaries as so described. Stated on both were the names of the owners of the surface estates only. Although all conveyances where mineral estates had been severed appeared of record, no express limitation of the assessment to the surface estates (nor exclusion of the subsurface estates) of the several parcels were noted in the assessment documents. Delinquencies occurred in some and finally on all of the lands here involved. The delinquency lists and notices of sale published (Wat. Code, § 26102) which are required to state the names of the assessees included only the names of the surface owners. The lands were sold; they were unredeemed and ultimately collector's deeds were issued on a total of 19 parcels here involved. The earliest of these deeds was in 1926, the latest in 1953.

In the meantime, Lava Cap continued to operate the mines until 1943 when production was stopped by the War Production Board. During the period of operation $11,000,000 in gold and silver were recovered. Uncontradicted testimony of

---

[1] The deed to the subsurface (mineral) right included an easement over the surface estate to enter thereon to develop the mines and "to build, maintain, and use all necessary roads, ditches, pipelines, electric lines, shafts, buildings, mills ... [etc.] of every nature or convenience to carry on said work...." The present existence and effect of this easement will be considered below.

defendant's expert was that ore reserves remaining have a value of over $2,000,000. When mining operations were discontinued, the mines were allowed to fill with water. An office is maintained by Keystone (on neighboring property to which it has surface title); a manager and a caretaker are employed to protect mining shafts and equipment. Mining operations have not been resumed.

The record is silent as to any acts of dominion exercised or attempted to be exercised by the district during the period from 1926 until it instituted this suit to quiet title in October 1959. Keystone's manager testified that the filing of the suit was that corporation's first notice of any claim by the district to the mines. The title report issued to Keystone when it purchased the mines had made no mention of any rights or claims of the district. (Keystone owns a fee simple title to the surface of other lands upon which it was assessed by the district and it paid these assessments.) When the district filed its complaint, Keystone cross-complained, seeking to quiet *its* titles.

The trial court's judgment upheld the district's claim both to the surface and subsurface estates. (Record owners of the surface estate had defaulted.) Basis of the court's determination (as evidenced by a memorandum opinion) was the collector's deeds, and a purchase of tax titles from the County of Nevada. (The latter affected only the surface rights. Nevada County had assessed the surface and subsurface estates separately. Keystone and its predecessors had paid all taxes levied against the subsurface; only the surface assessments had been sold and deeded to the county for delinquencies.)

The trial court in its memorandum observed that its ruling for the district was because Keystone's defense and cross-complaint were barred "by the plain terms of" Water Code section 26304.[2]

We hold that the trial court erred; that Water Code section 26304 is inapplicable.

It should first be noted that the interests in land we consider are not a single fee simple title, with a portion carved therefrom as a lesser estate (e.g., an easement) from a greater. We have instead a whole cut into two parts with equal status.

---

[2]This section provides in part: "An action ... defense, answer ... or cross-complaint based on ... the alleged ineffectiveness of the [collector's] deed to convey the absolute title to the property described in it may be commenced or interposed only within one year after the recordation of the deed."

■ The owner of real property may divide his lands horizontally as well as vertically, and when he conveys the subsurface mineral deposits separately from the surface rights, or reserves them from a conveyance of such surface rights, he creates two separate fee simple estates in the land, each of which has the same status and rank. (*In re Waltz*, 197 Cal. 263 [240 P. 19] ; *United States* v. *4.553 Acres of Land etc. in County of Monterey*, 208 F. Supp. 127.)

■ Land is usually described by measurement of, or other reference to, its surface boundaries. Where there has been no severance of the mineral estate, a conveyance by such description will pass both the surface and subsurface titles. But where the subsurface title has been previously severed, a conveyance according to the surface description which makes no mention of the subsurface estate passes only the title to the surface. The mineral rights are not affected. This is the rule at least where private grantors and grantees are concerned. (3 American Law of Mining, § 15.13, pp. 143, 144.)

As to the rule applicable to the validity of tax proceedings and a tax deed where a taxing agency has authorization to tax mineral estates as well as the surface and, *intending to tax both*, describes the land by surface description making no reference to the mineral estate, which in fact has been severed and the severance appears of record, there is a conflict of authority. In Oklahoma validity of a tax deed under such circumstances was upheld. (*Cornelius* v. *Jackson*, 201 Okla. 667 [209 P.2d 166].)

In Colorado, on the other hand (in *Mitchell* v. *Espinosa*, 125 Colo. 267 [243 P.2d 412]), it was held that where surface and subsurface (mineral) estates had been severed and this appeared of record, a tax deed describing the property sold by surface description without reference to the mineral rights, passed no title thereto. (In Colorado, however, a statute required that separate estates owned by different persons be assessed separately.) Other states have adopted the same rule. (*Ohio Oil Co.* v. *Wyoming Agency*, 63 Wyo. 2d [179 P.2d 773] ; *McCoy* v. *Lowrie*, 42 Wn.2d 24 [253 P.2d 415] ; *Kernkamp* v. *Wellsville Fire Brick Co.*, 237 Mo.App. 457 [170 S.W.2d 692] ; *Huffman* v. *Henderson Co.*, 184 Ark. 278 [42 S.W.2d 221].) No California case has been found ruling upon the question.

■ In the case at bench we do not deal with the questions just stated, however, because here the evidence was uncontradicted that mineral estates were not assessed separately

*because there was no intent by the district to assess them at all.*

The district's assessor, having testified that mineral estates were not assessed separately, later stated the district did not assess mineral rights at all.[3] He also testified: "Q. Now, assuming, and this is for the purpose of determining assessment value, if you had two identical surface lots, side by side, with identical surface value, one the entire fee including the mineral, the other the entire fee from which the mineral had been severed, would you assess them in any different amounts? A. I would not."

He stated it was a matter of both common and his own knowledge that in Nevada County mineral rights in many instances had been severed and were held in separate ownership. He also knew the county was assessing mineral estates and that they were being assessed separately. The district's assessment of the lands (surface rights) was on the basis of the full cash value thereof, excluding improvements, "on a potential productive agricultural value" basis.[4]

In addition to these recited declarations of the district assessor, other facts speak loud and clear for themselves to demonstrate the district intended no assessment of mineral estates. The many instances of severance and separate ownership of subsurface titles having been a matter of common knowledge in Nevada County, and within the personal knowledge of its assessor, full awareness thereof must be charged to the district's directors. Also known was the fact that the county assessor assessed surface and subsurface estates separately for county taxes. Under the irrigation district laws an irrigation district must ascertain and state in its assessment book the names of the owners of the properties it intends to asses, unless the names are "unknown." (Wat. Code, § 25505.) Its delinquent lists when published must also state these names. (Wat. Code, § 26102.) Obviously, the place where the district will obtain such names will either be at the

---

[3] "A. I assess all lands in the district. Q. All lands within the district? A. Yes. Q. It is your answer that you do not assess the mineral rights? A. That is right." Later he testified: "Q. In all circumstances you do not levee [*sic*] an assessment against the mineral value of the land. A. I do not."

[4] He explained his understanding of the meaning of that phrase as follows: "I personally feel that because this is an irrigation district that lands that receive water should have a much higher valuation than lands that cannot. Therefore 'productive agricultural' takes into consideration whether they can receive water."

office of the county recorder or of the county assessor. Keystone's name during the period of its ownership and the name of its predecessor theretofore appeared as owners of the fee simple title to the subsurface mineral rights in both of these places; yet the district made no effort to find out such ownerships. It was not interested.

Nor was it interested in the mining activities which obviously were going on from 1926 until 1943 during which period large values in gold and silver were being recovered. If the district's now-position is valid, the district was entitled to enjoin these activities as a trespass and sue for these recoveries as far back as 1926 when its first collector's deeds were taken. No right in the subsurface estates was then manifested, nor is there any evidence of a claim until this suit was brought.

Keystone does not challenge the right of an irrigation district to levy assessments against mineral estates in lands within its boundaries which may receive benefits, direct or indirect, from the services of the district. Its contention is that the district, when it elects to assess mineral rights must do so prospectively and cannot give its delinquent tax sales and collector's deeds retroactive application to affect mineral estates by the fortuitous circumstance that the descriptions on the assessment rolls, certificates of sale and collector's deeds did not exclude the mineral estates. This contention is sound. Not only would it be unconscionable to divest the owner of title to his subsurface estate and transfer such ownership to the district through the hocus-pocus of an inadvertent inexactness of description, but neither principle or rule of common law nor statute requires that result. A taxing agency which has had no intent to assess mineral estates does not assess them even though the unmeant description of lands on the assessment book may be broad enough to include such interests. If, intending to assess only the surface estate, it unwittingly drafts a description broad enough to cover both surface and subsurface estates, the inclusion of the latter is a mistake and it cannot be permitted to reach for tax purpose an estate it never sought. Although no California case in point on this precise question has been called to our attention, the problem is not appreciably different from that existing where a taxing agency mistakenly doubly assesses land, so that a nondelinquent tract is also included in a larger parcel owned by another who allows his taxes to become delinquent. The rule in such cases is well settled (1) that the

tax deed conveys no title to the nondelinquent land; and (2) that a special statute of limitations barring actions based upon the alleged ineffectiveness of a tax deed after a specified period, is inapplicable. We recently reasserted this rule in *Nutting* v. *Herman Timber Co.*, 214 Cal.App.2d 650 [29 Cal.Rptr. 754]. Therein, on page 656, we noted the distinction between tax deeds voidable because of some irregularity in the tax proceedings (not amounting to a deprivation of due process) and a tax deed void because the proceedings were a nullity due to the nondelinquency of the lands assessed, stating that to attempt to breathe life into the latter deed via either curative acts or statutes of limitation was confiscation violating due process. Equally confiscatory would be an attempt to give vitality, as against the owner of a mineral estate, to a deed derived from tax proceedings aimed only at the separate and severable surface estate. We hold that the tax deed here, although its description was broad enough to include both surface and subsurface rights, was ineffective to include the latter which were not the subject of the district's assessment and, therefore, not delinquent.

 The trial court found that Keystone was not an owner in actual possession. We do not consider this to make any difference since neither the district nor Keystone claims a title by adverse possession. In determining that Keystone was not in actual possession, however, the court erred. Keystone's predecessor had operated the mines until it was compelled by law to discontinue operations. It then allowed the mines to fill with water, thus effectually sealing them off, "locking the vault" containing the estimated $2,000,000 in gold and silver lying within. It did this awaiting the time when the mining of gold and silver will again be economically feasible. In addition, it placed a caretaker as a guard, to labor the metaphor, over its locked-up deposits. He watched over the shafts, equipment and other above-water improvements of the mines. Lava Cap maintained an office and a manager. Keystone, since its acquisition of the property from Lava Cap, has done the same. Unless and until profitable mining can again be undertaken, what more could any owner do, or be required to do to maintain *actual* possession, remembering that this is not a placer mining claim but quartz mines owned in fee?

 "Actual possession" is " 'a subjection to the will and dominion of the claimant.' " (*Bell* v. *Towne*, 155 Cal. App.2d 225, 229 [318 P.2d 110], quoting Chief Justice

Field.) "Actual possession" and "occupancy" are synonymous. (*McKenzie* v. *Brandon*, 71 Cal. 209, 211 [12 P. 428].) This court noted (per Justice Schottky) in *People* v. *Berry*, 147 Cal.App.2d 33 [304 P.2d 818], that the term "occupancy" had been given various definitions in various connections; that it does not always require physical occupancy; that each case bases its interpretation upon a special context in connection with which the term is to be applied. With respect to a mining property (a tunnel), it was held in the early case of *Table Mountain Tunnel Co.* v. *Stranahan*, 20 Cal. 198, 209, that that which was actual possession depended upon mining laws and customs. (See also *Lofstad* v. *Murasky*, 152 Cal. 64, 68 [91 P. 1008].)

 Keystone, therefore, unquestionably has the only possession which anyone now has or can have practically of mines "watered" to seal them off.

Considering Keystone as an owner of the mines in actual possession, what we stated in *Nutting* v. *Herman Timber Co.*, *supra*, 214 Cal.App.2d 650, at pages 656-657 (quoting from *Cameron Estates, Inc.* v. *Deering*, 308 N.Y. 24 [123 N.E.2d 621, 623]) seems particularly apropos:

" ' ... A Statute of Limitations is one of repose designed to put an end to stale claims and was never intended to compel resort to legal remedies by one who is in complete enjoyment of all he claims, Cooley on Constitutional Limitations, p. 366, nor may it be used to transfer property from the true owner to a stranger simply because the void tax deed was not challenged within six years from the date of recording. . . .' "

We are not, however, to be understood as resting our determination of the invalidity of the district's claim upon the fact of Keystone's actual possession. Its title, as stated above, does not depend upon this.

Another issue remains to be disposed of. Keystone claims an easement as described in footnote 1, *supra*, and by cross-complaint sued to quiet title thereto. A prima facie case was made when it produced the mesne conveyances through which it had acquired title. Title to the easement as claimed deraigned from Jennings and it was an easement by grant.

Assuming its continued existence throughout the years, it was not lost merely by the collector's deed. It was an easement on, over and upon the surface estate appurtenant to the title in fee simple to the mineral estate. The easement was not specifically assessed and, as we have held, the dominant

tenement was not assessed. ■ "An easement appurtenant is not extinguished by a sale and conveyance of the land subject to it for nonpayment of a tax assessed against such land." (Rest., Property, § 509, subd. (2), p. 3099, and see comment under said section for the rule's rationale.)

■ An easement by grant may be lost but it is not extinguished merely by nonuser. It may, however, be lost by abandonment or by adverse possession. (Civ. Code, § 811, subd. 3; *Clark* v. *Redlich*, 147 Cal.App.2d 500, 507 [305 P.2d 239].)

■ Extinguishment by abandonment is effected by the concurrence of three elements: (1) nonuser, (2) intention to abandon (as to which it has been said the evidence must be clear and unequivocal) and (3) damage to the owner of the servient tenement. Nonuser if long continued is some evidence of abandonment. (17 Cal.Jur.2d, "Easements," § 36, p. 144; *Smith* v. *Worn*, 93 Cal. 206, 212 [28 P.944]; *People* v. *Southern Pac. Co.*, 172 Cal. 692, 700 [158 P.177].)

There was no specific finding by the trial court on the issue of the existence of the easement. References in the record to the exercise by Keystone and its predecessor of their rights on the surface are unclear. When these uses are being described by the witnesses, it is difficult or impossible to determine whether the use being described is on lands, the surface of which Keystone owned in fee, or on lands on which it held only an easement. In fact, the issue seems to have been lost sight of by both the litigants and the trial court; understandably since if Keystone's title to the mining fee (the dominant tenement) had been cut off the easement would certainly have been extinguished. (Civ. Code, § 811, subd. 1.) We cannot decide the question of abandonment on the existing record.

The judgment is reversed with instructions to the trial court to enter judgment quieting Keystone's title to the subsurface (mineral) estate of the subject lands against the district's claims. As to the restricted issue of the existence of said easements, there shall be a new trial consistent with the views expressed herein. Keystone shall recover costs on appeal.

Schottky, J., and Friedman, J., concurred.